# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**HENRY T. VALENTINE,**

      **Plaintiff,**

**v.**
                            **Civil Action No. 2:04CV79**
                            **(The Honorable Robert E. Maxwell)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Childhood Disability Benefits and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

## I. Procedural History

Harry T. Valentine ("Plaintiff") filed an application for DIB on May 14, 2002, for alleged disability since June 1, 1997, due to learning disability, right ear deafness, short-term memory loss, leg injuries, back injuries, nerve problems, and vision problems in both eyes (R. 71-73, 83,194).[1]

---

[1]Plaintiff filed two prior applications for childhood disability benefits, which were denied in July 1996 and April 1997. On May 14, 2002, Plaintiff filed his third application for childhood disability benefits based on his deceased father's earnings and on which this appeal is based (R. 20). 20 C.F.R. § 404.350 lists the following criteria that must be met in order for a person to apply for childhood disability benefits: (a) General. You are entitled to child's benefits on the earnings record of an insured person who is entitled to old-age or disability benefits or

Plaintiff's application was denied at the initial and reconsideration levels (R. 47-58). Plaintiff requested a hearing, which Administrative Law Judge Jay Levine ("ALJ") held on September 3, 2003, and at which Plaintiff, represented by Travis Miller, Esquire, and Larry Bell, Vocational Expert ("VE"), testified (R. 549-74) On November 25, 2003, the ALJ entered a decision finding Plaintiff was not disabled (R. 20-29). On September 24, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 7-10).

## II. Statement of Facts

Plaintiff was born on May 20, 1978, and was twenty-five (25) years old on the date of the ALJ's decision (R. 71). He graduated high school, where he attended special education classes, and attended college (R. 83, 200, 502). Plaintiff also attended vocational classes for training in computer use (R. 200). Plaintiff's past relevant work included brief employment from 1997 to 1998 as an adult care worker (R. 185, 194).

On September 4, 1993, Plaintiff was hospitalized at West Virginia University Hospitals for injuries he sustained in an automobile accident (R. 239-253). Plaintiff was treated for the following:

---

who has died if--(1) You are the insured person's child, based upon a relationship described in §§ 404.355-404.359; (2) You are dependent on the insured, as defined in §§ 404.360-404.365; (3) You apply; (4) You are unmarried; and (5) You are under age 18; you are 18 years old or older and have a disability that began before you became 22 years old; or you are 18 years or older and qualify for benefits as a full-time student as described in § 404.367. Based on this regulation, Plaintiff must prove he was disabled on or before June 30, 2000, the first full month after his attainment of the age of twenty-two (22). Additionally, although Plaintiff applied for childhood disability benefits based on his deceased father's earnings, the ALJ evaluated his claim on the rules of evaluation which apply to adult disability cases because he was eighteen (18) years of age at all times relevant to the instant case. See 42 U.S.C. 1382c(a)(3)(C)(i) and 20 C.F.R. § 416.924(f).

myocardial contusion; frontal and maxillary sinus facial fractures; right basilar skull fracture with cerebrospinal fluid leak and perforated tympanic membrane; pneumocephaly; left first rib fracture; bilateral pedicle fracture on T1 vertebra; left femur fracture, closed, proximal third; and full thickness, "2x2 cm" burn on the left dorsal ankle (R. 236). A CT Scan of Plaintiff's head and cervical spine and an x-rays of Plaintiff's knee, thoracic spine, cervical spine, femur, lumbar spine, skull, and sacrum confirmed the existence of these injuries (R. 266-269).

On September 5, 1993, Plaintiff was transferred to Allegheny General Hospital (where his mother was hospitalized as a result of the same motor vehicle accident) for trauma services (R. 236-38). A CT Scan taken of Plaintiff's head that date revealed the following: 1) "[t]ransverse fracture of the right temporal dome, clinical correlation with right otorrhea is suggested"; 2) "[e]xtensive fractures of the facial bones including orbital roofs, anterior and posterior walls of the frontal sinus and comminuted fractures of the ethmoid air cells" and possible "small fracture fragments in the right orbital apex and compromising the superior orbital fissure"; 3) "[p]arenchymal contusion in the right occipital lobe"; and 4) "[s]light dilation of the right temporal horn" (R. 318). X-rays of Plaintiff's thoracic and lumbosacral spine taken on September 5, 1993, were normal studies (R. 320). Plaintiff's September 5, 1993, x-ray of his cervical spine showed the "widening of the retrotrachael space at C6" was 20mm, which exceeded the 14mm limit for a person Plaintiff's age (R. 324). A chest x-ray taken of Plaintiff showed a fracture of the first left rib (R. 322). A September 5, 1993, x-ray of Plaintiff's left femur showed a "comminuted fracture of the midshaft of the femur" with a laterally displaced small bone fragment (R. 300). Also on September 5, 1993, an facial CT Scan was taken of Plaintiff. It revealed the following: 1) fractures of the right maxillary antrum, anteriorly and posteriorly; 2) a fracture of the lateral wall of the sphenoid sinus, posterior;

3) fracture of paper plate of the right ethmoid sinus; 4) nasal bone fractures; and 5) frontal sinus fracture (R. 298).

On September 6, 1993, Plaintiff underwent an open reduction and internal fixation of his left femur at Allegheny General Hospital (R. 280). Also on September 6, 1993, Michele Monaco, M.D., completed a cardiac function consultation of Plaintiff at the request of Michael Hirsh, M.D. Dr. Monaco's impression was that Plaintiff "most likely had a myocardial contusion," which was mild, and Plaintiff had a "minimal hypokinesis of the right ventricular apex" (R. 307).

On September 7, 1993, John Campo, M.D., completed a psychological consultative evaluation of Plaintiff. Dr. Campo observed Plaintiff fluctuated in his level of consciousness, was pleasant and cooperative, was distracted, was disinhibited and inappropriate in social manner, was disorganized in his thinking, was disoriented to place, and had difficulties with memory and concentration. Dr. Campo's impression was for acute delirium (R. 303).

On September 16, 1993, while Plaintiff was still a patient at Allegheny General Hospital, Dr. Mark Lovell completed a neuropsychology consultation of Plaintiff at the request of Dr. Hirsh. Dr. Lovell administered the Children's Orientation and Amnesia Test (COAT); Automatized Series; Reitan-Indiana Aphasia Screening Test; Wide Range Assessment of Memory and Learning (WRAML) – Verbal Learning, Story Memory, Design Memory, Picture Memory; and Contingency Naming Test to Plaintiff. Dr. Lovell opined that Plaintiff continued to "experience effects of post acute dysfunction consistent with recovery from a head injury." He observed Plaintiff's "orientation was still well below average," although he had improved considerably "from 4 days post accident." Dr. Lovell opined that Plaintiff could not "recite more than 4 digits forward" and "showed impairment in each domain assessed" (R. 294). Plaintiff was observed to demonstrate prominent

4

language difficulties, poor memory skills, impaired executive control skills, and impaired vision, which may have resulted from Plaintiff using improper glasses as his newer prescription glasses were destroyed in the car accident (R. 295). Dr. Lovell found as follows: Plaintiff demonstrated "generalized effects characteristic of the immediate post recovery phase; significant impairments . . . on each task attempted" (R. 295).

Plaintiff was discharged from Allegheny General Hospital on September 17, 1993, with the following diagnoses: closed head injury, face fractures, myocardial contusion, T-1 pedicle fracture, left femur fracture, and second degree burns to right hand and foot (R. 278). He was transferred to rehabilitation and instructed to seek the care of Dr. Hirsh in two (2) weeks (R. 279).

On October 23, 1993, Plaintiff was admitted to Allegheny General Hospital for a broken femoral plate. Plaintiff underwent surgery, and the left femoral plate was removed. Plaintiff had "IM rodding of his left femur" (R. 340, 341, 342).

On October 26, 1993, while still a patient at Allegheny General Hospital, Plaintiff underwent a consultative neuropsychology evaluation to test cognitive functioning, which was conducted by Dr. Lovell upon request of Spencer Butterfield, M.D. Dr. Lovell conducted the following test procedures: 1) picture memory, design memory, story memory, and verbal learning subtests from the Wide Range Assessment of Memory and Learning Test (WRAML); 2) digit span subtest from the Wechsler Intelligence Scale for Children-Revised; 3) Trail Making Test for Children (parts A and B); 4) Oral Word Fluency Test; 5) Children's Orientation and Amnesia Test; 6) Aphasis Screening Test; and 7) the Wisconsin Card Sorting Test. Dr. Lovell opined the test results revealed Plaintiff was "experiencing mild residual effects associated with his head injury"; specifically his attention capacity, cognitive flexibility, and new learning efficiency were impacted (R. 348). Dr.

5

Lovell observed Plaintiff had no apparent deficits in his basic sensory faculties; he performed adequately on more spatial-integrative tasks; his grapho-motor and constructional abilities appeared to be intact; his linguistic skills were intact; his receptive language faculties were efficient; his expressive speech was intact; but he performed weakly in integrating visual information and list learning tasks (R. 348-49). Dr. Lovell concluded Plaintiff demonstrated "residual cognitive deficits associated with a post-concussion syndrome. . . ." Dr. Lovell recommended re-testing in three (3) months so "a more comprehensive assessment in order to provide recommendations regarding educational accommodations, if any" could be made (R. 349).

On January 27, 1994, Linda R. Britton, Ph.D., completed psychological assessment of Plaintiff's cognitive functioning, which included WISC-III IQ testing, WRAT-3 achievement testing, Bender-Gestalt testing, and Human Figure Drawing (R. 361-65). Ms. Britton noted that Plaintiff had been evaluated in April, 1988, at which time he was found to be within the low average range of ability, but did not qualify for special education services (R. 361). During testing, Ms. Britton observed Plaintiff to exhibit good attention, effort, and an "orderly plan" in "answering and working on problems." Ms. Britton noted Plaintiff was "inconsistent" in recognizing errors. She observed Plaintiff to be quiet, but fluently conversant in response to test questions. Plaintiff was able to follow and understand instructions without repetition and/or emphasis and did not become frustrated. Ms. Britton opined the test results were valid. Ms. Britton found Plaintiff's Verbal IQ was 80 (low average range); Performance IQ was 71 (borderline range); and Full Scale IQ was 73 (borderline range). Plaintiff's verbal comprehension deviation quotient was 80, his perceptual organization deviation quotient was 71, and his short-term memory deviation quotient was 58, and this last quotient was considered as "lower performance" (R. 363). Ms. Britton noted Plaintiff's "vocabulary subtest score was significantly higher than the other verbal scale subtests," which

suggested "a superior ability in expressive language and word knowledge." Plaintiff's Digit Span "was significantly lower," which indicated "poor auditory short-term memory or attention skill" (R. 364). Plaintiff's WRAT-3 Reading standard score was 94 and his grade equivalent was eighth and WRAT-3 Arithmetic standard score was 81 and his grade equivalent was fifth (R. 364). Plaintiff's "Bender drawings showed a good attempt at organization on an unstructured task" and his "Human Figure Drawing was somewhat immature and lacking in significant detail," which suggested "feelings of inadequacy, inferiority, and insecurity" (R. 365). Ms. Britton's observations and educational recommendations were as follows: 1) limited academic pressure given consideration; 2) verbal/language skills were stronger than visual/motor/perceptual skills; 3) "low average to average potential on a few of the WISC-III subtests"; 4) short-term auditory memory and/or concentration suggested cognitive difficulty; 5) relatively weak spatial relations and visual/motor integration; 6) word identification skills stronger than math calculation skills; 7) "short directions"; and 8) simple, uncluttered written tasks (R. 365).

Subsequent to the evaluation conducted of Plaintiff by Ms. Britton, Virginia V. Landrum, a certified school psychologist, evaluated Plaintiff. She noted Plaintiff's verbal score placed him within the low average range of intellectual functioning and his nonverbal score placed him within the borderline range, which was well below average. Ms. Landrum noted Plaintiff's April 1988 evaluation revealed his functioning to be within the average range in verbal intelligence and low average range in nonverbal intelligence (R. 366). Plaintiff was found by Ms. Landrum to be within the low average range in reading, math, written, language, and broad knowledge, based on his scores on the Woodcock-Johnson Test of Achievement. Ms. Landrum noted Plaintiff's hearing in his left ear was within normal limits, but Plaintiff was found to have "profound nerve loss in the right ear"

(R. 367). Ms. Landrum recommended the following: 1) placement in special education services for academic work; 2) modification in classes to accommodate Plaintiff's "loss in visual-motor integration skills"; 3) enrollment in a word processing computer program; 4) annual hearing tests; and 5) academic placement evaluations on a semester basis (R. 369).

On February 2, 1994, Plaintiff underwent an audiological evaluation, which was conducted by Darah Regal, M.A., CCC-A, Audiologist for the Randolph County Schools. The evaluation revealed Plaintiff's left ear hearing was within normal limits, but he had "profound nerve loss in the right ear" and that "no responses were obtained for the right ear." Audiologist Regal opined there was no way to discern how well Plaintiff would adjust to the hearing loss (R. 370).

On February 5, 1996, Plaintiff reported to C. S. High, M.D., that he passed out "a lot." Dr. High noted Plaintiff had not sought the care of a neurologist (R. 484).

On March 22, 1996, Plaintiff underwent the removal of the proximal locking screw and femoral rod from his left femur at Allegheny General Hospital. This surgery was performed by Dr. Butterfield (R. 372-80). An x-ray of Plaintiff's leg and hip revealed that no fracture or dislocation existed and his hip and knee joint spaces were "maintained" (R. 378).

On April 9, 1996, Plaintiff was examined by Dr. Butterfield, who opined Plaintiff's "wound" was healed and observed Plaintiff was "barely using a cane." On May 21, 1996, Dr. Butterfield observed Plaintiff walked with no "limp or lurch" and had no knee limitations; he opined Plaintiff could be released for all activities (R. 381).

On June 26, 1996, Alex Ambroz, M.D., completed a consultative examination of Plaintiff for the West Virginia Disability Determination Service. Plaintiff's chief complaints were: "fatigue, ears, eyes, hip, headaches, gets cold easy, short-term memory loss and short attention span."

Plaintiff stated his symptoms occurred constantly throughout the day and were becoming "worse and more frequent." His symptoms, Plaintiff stated, interfered with his activities of daily living because "he forgets instructions from teachers," and pain caused by prolonged standing interfered with his ability to work (R. 387). Dr. Ambroz reviewed Plaintiff's following systems: HEENT, neck, chest and lungs, gastrointestinal, genitourinary, musculoskeletal, neurological, endocrine, vital signs, visual acuity, extremities, back, and mental status, and no significant deficits were revealed (R. 388-89). Dr. Ambroz's impression was for 1) multiple somatic complaints; 2) syncope; and 3) status post fracture to the left hip with surgical repair. His assessment was that Plaintiff's "physical examination did not reveal severe deficits. He has syncopal episodes twice a day. A brain scan was negative. These episodes last 15 to 20 minutes" (R. 390).

On July 4, 1996, Fulvio Franyutti, M.D., a state-agency physician, completed a Residual Physical Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff had no exertional limitations, no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations (R. 392-99).

On July 11, 1996, William Fremouw, Ph.D., conducted a psychological interview of Plaintiff. Plaintiff stated he was deaf in his right ear, had "hurt" his left leg and hips, had a learning disability, and received tutoring in math, English, and social studies. Mr. Fremouw noted Plaintiff was deaf in his right ear, had weakness in his left side, did not walk with a cane or limp, slept adequately, had a good appetite, had no "problems with depression or anxiety" except for weeping when thinking about the death of his father, and had no memory of the motor vehicle accident (R. 401). During the interview, Plaintiff appeared to be in a "pretty good" mood, he maintained eye contact, he was friendly, he could recall five digits forward and three backwards, he knew current events, he was

9

coherent and logical, he showed no delusions or hallucinations, he had no suicidal or homicidal thoughts, and he had no panic phobias or fears (R. 402). Mr. Fremouw administered the Wechsler Adult Intelligence Scale-Revised Test to evaluate Plaintiff's intelligence. He scored as followed: Verbal Scale IQ was 82; Performance Scale IQ was 86; and Full Scale IQ was 82 (R. 402-03). The Wide Range Achievement Test III was administered to Plaintiff. He scored as followed: Reading – Standard Score 91 – Grade Equivalent 8th; Spelling – Standard Score 93 – Grade Equivalent 8th; and Arithmetic – Standard Score 80 – Grade Equivalent 6th. Mr. Fremouw opined Plaintiff was four to six years behind grade level, but he did not show a learning disability. Mr. Fremouw made the following objective findings: Plaintiff's IQ was low average; his achievement scores were consistent with his intelligence; and he had undergone no psychiatric care. His diagnostic impression was as follows: Axis I – no diagnosis; Axis II – no diagnosis; Axis – deafness in his right ear and left hip trauma (R. 403).

Plaintiff informed Mr. Fremouw that his summer activities of daily living consisted of rising at 9:00 a.m., going outside to view the garden and yard; visiting a neighbor, removing household garbage for his mother, watching television in the afternoons, using the computer, revisiting his neighbor, and retiring at 10:00 p.m. (R. 403). Plaintiff stated he regularly visited two friends, enjoyed hunting, and enjoyed using the computer. Plaintiff stated he bathed daily, did not date, and went to church twice per week. Mr. Fremouw noted Plaintiff's concentration and pace as "good" (R. 404).

On July 18, 1996, Frank Roman, Ed.D., a non-examining psychologist, reviewed Mr. Fremouw's evaluation and opined that Plaintiff had no medically determinable mental impairment (R. 406).

10

On December 2, 1996, Plaintiff reported to Dr. High that he passed out three to four times per week. Dr. High did not offer a diagnosis of disability (R. 480).

On January 21, 1997, an audiological evaluation was performed of Plaintiff by Linda M. DeWitt, M.S., CCC/A, Audiologist for the Randolph County Schools. Ms. DeWitt found Plaintiff to have "essentially normal hearing in the left" ear and "a profound sensorineural hearing loss" in his right ear. She observed Plaintiff "to hear and understand speech . . . in the left ear and profoundly impaired in the right ear." Plaintiff was able to "understand all directions once they were thoroughly explained and practiced" (R. 416).

On January 30, 1997, James J. Woodward, M.A., M.A., Ed.S., School Psychologist for the Randolph County Schools, completed a psychological-educational evaluation of Plaintiff. Mr. Woodward administered the Wechsler Adult Intelligence Scale-R Test, the Bender Visual Motor Gestalt Test, the Direct Observation/Interview, and the Draw-A-Person Test (R. 418). Mr. Woodward opined the following as to Plaintiff: 1) there were no difficulties noted or observed with Plaintiff's vision or hearing; 2) his oral communication skills, listening comprehension skills, attitude and effort toward test taking, social skill development, motor activity level during testing, overall speed of work during testing, interest in accuracy during testing, anxiety level, attitude toward learning and school, home variables, and global assessment of functioning were average; 3) his gross motor skill and fine motor skill development, ability to concentrate and stay on task during testing, memory areas, and perception areas were below average but acceptable for valid test results; and his cognitive areas were below average and may have negatively influenced the test reliability or validity (R. 419). Plaintiff's Verbal IQ was 90, his Performance IQ was 86, and his Full Scale IQ was 88. Mr. Woodward found Plaintiff broad reading score to be 9.8 grade, his broad math score

11

to be 5.9 grade, his broad written language to be 6.4 grade, and his broad knowledge to be 6.5 grade (R. 421). Mr. Woodward recommended continued special education support for Plaintiff, extensive assistance in Plaintiff's transition to technical school, and encouragement of Plaintiff's family to become involved in his education (R. 243).

On March 6, 1997, Plaintiff was assessed by the Randolph County Schools Evaluation Summary Team. This team found Plaintiff had specific learning disabilities because of a traumatic brain injury. They noted the "exceptionality adversely" affected Plaintiff's educational performance and that Plaintiff needed "specially designed instruction." The team recommended that, since Plaintiff tested "low enough in math to show a significant discrepancy between achievement and ability" . . . , "he may need extra time or modifications to curriculum in math" (R. 162).

On May 21, 1997, three of Plaintiff's teachers completed a Teacher/School Personnel Questionnaire of Plaintiff. They noted Plaintiff worked very hard on his basic skills at grade level, worked at grade level with grading and assignment modifications, and worked at grade level in his classes and on the job site. The opined Plaintiff stayed on task, but had difficulty keeping up to the class pace in his business computer class. The teachers noted Plaintiff did complete assignments, even if he had to be afforded additional time to do so (R. 207). The teachers stated that instructions sometimes had to be repeated because of Plaintiff's hearing loss, and his hearing loss also interfered with his ability to comprehend. Plaintiff was observed to relate well to others and to possess good interpersonal skills. They noted he was very task oriented (R. 208).

On June 10, 1997, Joseph Kuznair, Ed.D., a non-examining psychologist, completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had no mentally determinable impairment.

Also on June 10, 1997, Thomas Lauderman, D.O., a state-agency physician, completed a Residual Physical Functional Capacity Assessment of Plaintiff and found Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations (R. 437-46).

On July 30, 1997, Samuel Goots, Ph.D., opined he had reviewed all the evidence in Plaintiff's file and, based on that review, affirmed the June 10, 1997, assessment of Mr. Kuznair (R. 427).

On October 10, 1999, Plaintiff was admitted to the West Virginia Rehabilitation Center for a vocational evaluation (R. 447). It was noted Plaintiff could read on a high school level, spell on an 8th grade level, and perform math on a 6th grade level. Plaintiff scored in the 10th percentile in the Bennett Mechanical Comprehensive Test and in the 5th percentile in the Revised Minnesota Paper Form Board Test (R. 449). Plaintiff was found to be below average in his manipulative skills and clerical abilities (R. 450). It was noted Plaintiff could follow simple and complex verbal instructions, simple diagrams, and simple written instructions, but could not follow complex diagrams or complex written instructions. It was noted Plaintiff could add, subtract, multiply, and divide, but not work with decimals, percentages, or fractions (R. 451). Plaintiff was found to be capable of performing his own personal hygiene and grooming, to be punctual, to be able to conform to rules, to maintain attention span, to accept supervision, to work independently, to work persistently, to react to unpleasant tasks, and to plan and organize activity (R. 451-52). Plaintiff's work quantity, work quality, attention to detail, and acceptance of constructive criticism were found to be marginal. Plaintiff's work effort, dependability, emotional stability, ability to meet work schedules, ability to care for materials and property, and safety awareness ability were found to be assets (R. 452).

13

The Work Evaluation Report of Plaintiff, conducted by Ronald K. Cockeram, in conjunction with the vocational evaluation, was completed on October 14, 1999. Mr. Cockeram noted Plaintiff spoke softly, with moderate volume and good articulation. He expressed himself adequately. Plaintiff stated he had attended Fairmont State College, had worked as an adult care giver, and had worked as a janitor at Wimpy's. He stated he could lift seventy-five pounds and walk for approximately one mile before his left hip hurt. Plaintiff stated he "needed a job where he [could] basically sit." Plaintiff stated he had a driver's license and a vehicle and he enjoyed hiking, fishing, and hunting. Plaintiff made good eye contact during the interview and presented with an intact long and short term memories (R. 453). Mr. Cockeram noted when Plaintiff reported to the Work Evaluation Unit, he was well groomed and punctual. During the evaluation, Plaintiff was cooperative with evaluator and co-workers, was talkative, had a good attention span, was not distracted by room noises, worked steadily, concentrated adequately, worked independently, worked with little help, produced marginal work product, worked quickly on clerical tasks, worked inconsistently on tasks that required manipulative skills, planned and organized his work, maintained good work effort, showed attention to detail on basic computer, and showed average to below average attention to detail on clerical work (R. 455).

At the conclusion of the work evaluation process, Mr. Cockeram noted the following: 1) Plaintiff expressed some interest in returning to college; 2) Plaintiff expressed some interest in attending business education program at the West Virginia Rehabilitation Center; 3) Plaintiff would make a marginal college candidate; 4) Plaintiff should improve his attention to detail; 5) Plaintiff expressed an interest in the job of security guard; 6) Plaintiff should not be employed in a field that required excess walking; 7) Plaintiff should be employed in a job "where he can sit at a desk or

14

patrol grounds in a cart or an automobile"; and 8) Plaintiff expressed a primary desire to work with computers (R. 456-57).

On June 18, 2002, Fred W. Cuder, R.N.P. with Dr. High, noted Plaintiff had last been seen on April 18, 2001, at that office and had not been treated for disability problems (R. 495).

On August 9, 2002, Sharon Joseph, Ph.D., completed an Adult Mental Profile of Plaintiff. The testing tools she used were a clinical interview, mental status, WAIS-III, and WRAT-3. Plaintiff was twenty-four years old at the time of the profile. Plaintiff informed Ms. Joseph that he experienced post-traumatic stress syndrome as a result of the motor vehicle accident he survived when he was fifteen. Plaintiff stated he was in a coma for three months as a result of the motor vehicle accident (R. 502). Plaintiff stated 1) he continued "to have nightmares of the accident"; 2) "everytime [sic] he sees a large truck, he gets nervous"; 3) he did not "go on any mountain roads"; 4) he experienced "memory problems and several other neurological deficits related to his head injury"; 5) he experienced a back injury and was under the care of a physician for his "back problems, allergies, knee problems, stomach problems, eye problems"; 6) his "vision difficulties" began after the accident and continued to worsen; 7) he experienced migraine headaches three times per week; 8) his medications were Hydroxyzine Pam-50mg; Lorazepam-1mg; Acephex 20mg, and over-the-counter Tylenol PM; and 9) he was depressed (R. 502-03). At the time of the completion of the profile, Plaintiff stated he had not received any psychological counseling or therapy and had been taking anti-anxiety medications since April 25, 2002 (R. 503).

Plaintiff's Verbal IQ was 82; Performance IQ was 74; and Full Scale IQ was 76 on the WAIS-III Test (R. 503). Plaintiff scored as follows on the WRAT-3 Test: reading at high school level; spelling at sixth grade level; and arithmetic at fifth grade level. Ms. Joseph noted Plaintiff

15

put forth good effort on the testing and denied vision or hearing difficulties "interfered with his performance." Ms. Joseph opined Plaintiff's "cognitive status [was] felt to be a cognitive decline from previous functioning before the traumatic brain injury." During the completion of the profile, Plaintiff was observed to be alert and cooperative. His mood was noted as "mildly depressed," but Plaintiff denied any "preoccupations, obsessions, or compulsions" (R. 503).

Plaintiff stated he experienced "some appetite disturbance," experienced "sleep disturbance," was deaf in his right ear; had recently lost weight; had impaired taste and smell; had difficulty bending and reaching; experienced a broken leg on four different occasions – once in the automobile accident and three subsequent occurrences in the hospital; had a weak grip; stuttered occasionally; and had limited ambulation because of his impaired hip. Ms. Joseph observed Plaintiff's motor activity was "generally calm," speaking was "somewhat slow and halting," content was "generally relevant," and conduct during the interview was "cooperative" (R. 504).

Ms. Joseph observed Plaintiff had no psychomotor disturbances, an affective expression that was somewhat anxious, adequate insight, and adequate judgment. Plaintiff's immediate memory was found to be within normal limits, his recent memory to be markedly impaired, and his remote memory to be mildly impaired. Plaintiff's concentration was found to be moderately impaired, pace was within normal limits, and persistence was adequate (R. 505).

Plaintiff stated his activities of daily living included rising at noon, watching television, listening to music, visiting relatives and friends, retiring at 3:00 a.m., vacuuming "a little," cooking to a limited degree, navigating stairs, and occasionally driving a car. Plaintiff stated he became anxious when "in a big crowd," experienced post-traumatic stress symptoms if he saw "anything that reminds him of his accident," did not participate in any sport, fished "very little," and attended

church. Ms. Joseph found Plaintiff's interaction and socialization were mildly impaired (R. 505). Ms. Joseph made the following diagnostic impressions: Axis I – "cognitive disorder, NOS, secondary to severe head injury" and "post-traumatic stress disorder"; Axis II – borderline intellectual functioning; and Axis III – back, hip, knee, stomach problems; allergies; and migraine headaches "per claimant's report." Ms. Joseph found Plaintiff's medical prognosis could "only be determined by a physician. Psychological prognosis [was] poor to fair due to cognitive disorder secondary to severe head injury and untreated post-traumatic stress disorder." Ms. Joseph also found Plaintiff would "probably require some assistance in managing . . . benefits" (R. 505-06).

On August 12, 2002, Plaintiff underwent an Internal Medicine Examination, which was conducted by Kip Beard, M.D. Plaintiff informed Dr. Beard that his chief complaints were of back pain, left knee pain, and hip injury. Plaintiff stated he was unconscious for three months following the motor vehicle accident, had a left hip and knee injury, had a total of four surgeries following the accident, and had right ear hearing loss that could not be improved with a hearing aid (R. 496). Plaintiff asserted the left hip and left knee pain was worse with weight bearing, at night, and with dampness (R. 496-97). Plaintiff stated he had difficulty walking for more than a block or sitting for very long because of hip pain, and he had left knee and hip swelling, stiffness, and tenderness. Plaintiff was not under any physician's care for his left knee and hip conditions. Additionally, Plaintiff informed Dr. Beard that he had been treated for lower back pain by Dr. Guda, who prescribed medications and physical therapy in 2001 and recommended the use of a back brace and heat applications. Plaintiff stated his lower back pain radiated to the left hip, although he had "difficulty discerning left hip pain from pain radiating from his back" (R. 497).

Dr. Beard observed Plaintiff stood without assistance, had a left-sided limp when he

17

ambulated, had mild difficulty rising from a seated position, had discomfort stepping up to or down from the examining table, was comfortable when seated, and spoke understandably and heard and followed instructions without difficulty (R. 498). Dr. Beard found Plaintiff's radial, femoral, dorsalis pedis and posterior tibial pulses were palpable; no bruits; no peripheral vascular insufficiency; no chronic venous stasis changes, and no clubbing, cyanosis, or edema (R. 498-99). Dr. Beard found no cervical spine tenderness, no spasm, and normal cervical spine range of motion. Plaintiff's hands revealed full range of motion; right grip force of 90, 90, and 85 pounds; left grip force of 80, 80, and 80 pounds; and ability to button and pick up coins with either hands. Plaintiff's left knee revealed very mild patellar crepitations and left knee tenderness without redness, warmth, effusion, swelling, or laxity. His left knee flexion was normal and his right knee was normal. Dr. Beard found Plaintiff's dorsolumbar spine had pain on range of motion and tenderness without spasm. Flexion was limited to 70 degrees, extension to 20 degrees, and lateral bending to 20 degrees bilaterally. Dr. Beard observed Plaintiff's left leg was 2cm shorter than his right leg and that he had difficulty standing on his left leg alone. Plaintiff's seated straight leg was normal and supine was normal on the right and limited to 75 degrees on the left. Left hip range of motion caused pain (R. 499).

Dr. Beard's impression was as follows: 1) status post multiple injury from motor vehicle accident with a) left hip fracture status post open reduction and internal fixation, b) probably posttraumatic arthritis of the left hip, c) left knee pain, probably posttraumatic arthritis of the left knee, d) chronic back pain with chronic thoracolumbar strain, and e) right ear injury status post surgery; 2) reports of blurred vision; and 3) closed head injury and coma (by description) with a possible post concussive syndrome. Dr. Beard summarized his findings as follows: Plaintiff had

"diminished motion in the back without radiculopathy . . . mildly diminished motion in the left knee . . . diminished motion in the left hip . . . mild weakness of the left hip . . . some buttock atrophy present without sensory discrepancies . . . gait [that was] limping to the left . . . and difficulty with ambulatory ability associated with back and left lower extremity. Dr. Beard further summarized that, "regards to his ear," Plaintiff "was able to follow instructions not requiring any repeats" (R. 500). On October 11, 2002, Samuel Goots, Ph.D., completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found that Plaintiff was not significantly limited in his ability to understand and remember (R. 507). Mr. Goots found Plaintiff's sustained concentration and persistence were not significantly limited in his ability to 1) carry out very short and simple instructions and detailed instructions; 2) work in coordination with or proximity to others without being distracted by them; and 3) make simple work-related decisions (R. 507). Plaintiff was found to have moderated limited sustained concentration and persistence in his 1) ability to maintain attention and concentration for extended periods; 2) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) ability to sustain an ordinary routine without special supervision; and 4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 507-08). Mr. Goots also found Plaintiff to not be significantly limited in his social interaction and adaptation (R. 509). Mr. Goots opined Plaintiff retained "the capacity to understand and follow routine instructions with initial supportive supervision" (R. 509).

On October 11, 2002, Mr. Goots completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had a cognitive disorder and an anxiety-related disorder, in that Plaintiff experienced recurrent and intrusive recollections of a traumatic experience, which were a source of

marked distress (R. 513, 517). Mr. Goots found that these disorders caused a mild degree of limitation in Plaintiff's activities of daily living and social functioning, a moderate degree of limitation in maintaining concentration, persistence, or pace, and no degree of limitations caused by episodes of decompensation (R. 522).

On October 3, 2002, Cynthia M. Osborne, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push and/or pull unlimited (R. 468). Plaintiff was found to be able to occasionally climb, balance, stoop, kneel, crouch, or crawl (R. 469). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 470-71). Dr. Osborne opined Plaintiff should avoid concentrated exposure to extreme cold, wetness, vibration, and hazards, but was not limited to his exposure to extreme heat, humidity, noise, or fumes, odors, dusts, gases, poor ventilation, etc. (R. 471). Dr. Osborne reduced Plaintiff's RFC to light (R. 472).

On January 22, 2003, James Capage, Ph.D., reviewed and affirmed the October 11, 2002, Mental Residual Functional Capacity Assessment and Psychiatric Review Technique completed by Mr. Goots (R. 508, 512).

On April 22, 2003, Plaintiff self reported to Appalachian Community Health Center for a psychological evaluation. Amy Bowers completed an intake summary of Plaintiff. Plaintiff informed Ms. Bowers that he was "trying to get disability" and that his lawyer, whom he had retained in November, 2002, had recommended he undergo a psychological evaluation. Plaintiff stated he had been injured in 1993 in an automobile accident, in which his father had been instantly

killed and in which he and his mother had been injured. Plaintiff informed Ms. Bowers that he had been in a coma for three weeks, was completely deaf in his right ear, had had a swollen brain, had impaired eye sight (which continued to deteriorate), had poor memory, had "lost most childhood memories," had difficulty concentrating, was easily distracted, and had to repeatedly reread materials (R. 535). Plaintiff asserted he was "very emotional at times," his energy was "in the middle," he slept excessively, and his appetite varied. Plaintiff's affect was observed as tearful and cooperative, his mood was good, and his memory was poor. Ms. Bowers' clinical impression was as follows: Plaintiff's "lawyer recommended that he receive a psychological eval [because Plaintiff was] applying for disability." Plaintiff stated he needed to be in counseling "several yrs. ago, but his mom didn't want him to have that 'label' on him." Ms. Bowers' diagnostic impression was for: Axis I – PTSD – chronic; Axis III – Plaintiff reported deafness in one ear; Axis IV – death of father; Axis V – 65 (R. 536).

Plaintiff informed Ms. Bowers he had arthritis in his left hip as a result of the automobile accident, he had been hospitalized for two months as a result of the accident, and he was taking Tegratol and Tylenol P.M. (R. 537). Plaintiff stated he was depressed because his aunt and uncle had died recently; he felt hopeless, helpless, and worthless; he had good family relationships, he had a seizure in September of 2002 when he was driving and had been to a neurologist and several doctors; his heart raced at times; he did not experience panic attacks; he could not sustain employment because he had poor memory and an inability to concentrate; he cried at least one time per week; he worried about what others thought of him; and he awoke about the third of each month with hot flashes and "sweats" (R. 538-39).

On July 9, 2003, Plaintiff underwent a psychiatric evaluation by Dilip Chandran, M.D.

Plaintiff informed Dr. Chandran he had been in an automobile accident in 1993 in which his father had died. He and his mother were injured in the accident, and Plaintiff had been in a coma for three weeks. Plaintiff stated his injuries included brain injury, left hip injury, broken ribs, deteriorated eyesight, and poor memory/concentration. Plaintiff described symptoms of depression, anxiety, nightmares, flashbacks, withdrawal, sad moods, mood swings, irritability, frustration, feelings of worthlessness, and passive thoughts of death (R. 530). Plaintiff informed Dr. Chandran that he had suffered a seizure in September, 2002, and had been subsequently diagnosed with "Seizure Disorder," for which he was prescribed Tegretol, which eliminated the seizure activity (R. 531).

Dr. Chandran observed Plaintiff was "spontaneous in his various discussions," exhibited normal speech, had no "ticks, twitches, stereotypies" or any abnormal movements, had dysthymic/anxious mood and affect, had thought form with distractibility, demonstrated poor attention/concentration, and possessed racing thoughts. Plaintiff demonstrated no signs of blocking, perseveration, loose associations, tangentiality, suicidal thoughts, homicidal thoughts, or hallucinations or delusions. Dr. Chandran found Plaintiff's thought process to be consistent with post traumatic stress disorder symptoms, depression, and anxiety (R. 533).

Dr. Chandran's impression was for 1) Axis I – PTSD, Chronic, and dysthymia; Axis II – none; Axis III – history of car accident in 1993 with subsequent complications with a brain injury, seizure disorder since 2002, and right-sided deafness; Axis IV – car accident in 1993, death of father, financial stressors, inability to maintain employment; and Axis V – GAF 50% (R. 534). Dr. Chandran prescribed Zoloft 12.5mg, counseled Plaintiff on smoking cessation and caffeine minimization, and recommended Plaintiff seek counseling from Dr. Chandran on a monthly basis. Additionally, Dr. Chandran opined he did "not feel that [Plaintiff] would be able to work at any

22

gainful employment" (R. 534).

On August 20, 2003, Plaintiff returned to Dr. Chandran and stated he had experienced "some improvements with Zoloft," although he continued to experience "difficulty with poor concentration, occasional depressed moods, irritability, frustration, PTSD symptoms, and withdrawn behaviors." Dr. Chandran observed Plaintiff was pleasant and cooperative and not agitated or combative. Dr. Chandran opined Plaintiff's mood was "slightly dysthymic/anxious" and his affect was frustrated. Dr. Chandran increased Plaintiff's Zoloft dosage to 75 mg daily and noted his intent to closely monitor Plaintiff's "behaviors/moods/thought patterns and focus on overall behavioral modification strategies/individual therapy" (R. 529).

Also on August 20, 2003, Dr. Chandran corresponded with Harold E. Bailey, Jr., Plaintiff's lawyer. In his letter, Dr. Chandran stated Plaintiff's "PTSD symptoms have involved flashbacks, intrusive thoughts, nightmares and racing thoughts related to the auto accident experience. The Cognitive Disorder, NOS is related to his impairment overall cognitive functioning related to the head trauma. We also feel that he has had ongoing symptoms of dysthymia as evidence by a generally depressed mood for greater than two years . . . ." Dr. Chandran also wrote Plaintiff had had "difficulties with occasional feelings of hopelessness, sad moods, sleep disturbances and fatigue" and "symptoms of PTSD . . . ." According to Dr. Chandran, Plaintiff had "not met the criteria for any type of bipolar condition, psychotic disorder . . . ." Dr. Chandran wrote that he had "been informed that [Plaintiff's] claim [was] of 'Childhood' disability benefits and as per Social Security rules, his 'Childhood' eligibility ceased as of 3/30/2000 on his 22nd birthday. It is my understanding that the severe injuries occurred in 9/1993 and that these problems have been present prior to his 22nd birthday" (R. 527). Dr. Chandran informed Mr. Bailey that Plaintiff had

"significant limitations in his ability to perform any type of work. . . ." as he had "significant episodes of poor concentration, forgetfulness and confusion, . . . severe symptoms of depression, anxiety, intrusive thoughts and nightmares/flashbacks" (R. 527-28). According to Dr. Chandran's letter, Plaintiff was precluded from "making any type of decisions or following any type of instructions/rules" because of his symptoms." Dr. Chandran expressed hope "that some of the symptoms of PTSD/Dysthymia will improve with Zoloft." Dr. Chandran speculated that Plaintiff's "memory difficulties will persist secondary to the previous history of severe head trauma." He also informed Mr. Bailey that he did not have "any records of any type of Neuropsychological testing" that may have been done on Plaintiff, but noted he was "certain that this type of testing will reveal severe deficits" and suggested a referral to Chestnut Ridge Hospital for such testing (R. 528).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, the ALJ made the following findings:

1.  The claimant meets the non-disability requirements for childhood disability benefits set forth in section 202(d) of the Social Security Act (20CFR 404.352(b)(2).

2.  The claimant has not engaged in substantial gainful activity since his alleged disability onset date.

3.  The claimant has impairments considered severe based on requirement of the regulations.

4.  These medically determinable impairments do not meet or equal one of the listed impairments in Appendix One Sup-part B, Regulations 4. The claimant may meet some of the "A" requirements for listing 12.02, 12.05 and 12.06. For the "B" criteria, the claimant has "Mild", [sic] "Mild", [sic] "Moderate" and "Mild", [sic] thus not meeting the "B" requirements. There was no evidence of the "C" criteria in the record.

5.  I find the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of this decision.

6.  I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR sections 404.1527 and 416.927).

7.  The claimant has residual functional capacity to perform sedentary work.

8.  The claimant has no past relevant work.

9.  The claimant is classified as a younger individual.

10. The claimant has a high school education.

11. Although the claimant's total limitations do not allow [sic] to perform the full range of sedentary work, using medical/vocational rules 201.28 as a framework for decision making, there are a significant number of jobs in the national and regional economies which the claimant could perform, such as a machine tender, with 141,000 jobs in the national economy and 1,400 jobs in the regional economy; and as a general office clerk, with 299,000 jobs in the national economy and 2,900 jobs in the regional economy. The sampling of jobs provided do [sic] not appear to have duty requirements in the *Dictionary of Occupational Titles* (DOT) that should exceed the claimant's limitations. (SSR 00-4p).

12. The claimant has not been disabled within the meaning of the Social Security Act and in [sic] entitled to disability benefits under sections 202(d) and 223 of the Social Security Act (R. 28-29).

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case

before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.   The ALJ erred by rejecting Plaintiff's treating source opinion without conducting the analysis required for evaluating such opinions.

2.   The ALJ erred by failing to include all Plaintiff's actual impairments and limitations in his RFC finding and hypothetical.

3.   The ALJ erred by failing to resolve inconsistencies between the VE testimony and the Dictionary of Occupational Titles, as required by SSR 00-4p.

Defendant contends:

1.   Substantial evidence supports the ALJ's evaluation of the medical evidence and opinions of record.

2.   The ALJ's hypothetical question accurately sets forth the limitations resulting from Plaintiff's impairments.

3.   Substantial evidence supports the ALJ's conclusion that Plaintiff could perform the jobs identified by the vocational expert.

## C. Treating Physician

Plaintiff contends the ALJ erred by rejecting Plaintiff's treating source opinion without conducting the analysis required for evaluating such opinions. Defendant contends substantial evidence supports the ALJ's evaluation of the medical evidence and opinions of record.

The analysis of treating source opinions to determine the weight assigned to those opinions is found in SSR 96-2p, which mandates the following:

Controlling weight. This is the term used in 20CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:

- The opinion must come from a "treating source," as defined in 20CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."

- The opinion must be a "medical opinion." Under 20CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight.

- The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.

- Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.

If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight.

. . .

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

When the determination or decision:
is not fully favorable, e.g., is a denial; or
is fully favorable based in part on a treating source's medical opinion, e.g.,
when the adjudicator adopts a treating source's opinion about the individual's
remaining ability to function;

the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

The treating source to which Plaintiff referred in his argument was Dr. Chandran. As to the

opinion of Dr. Chandran, the ALJ made the following finding:

D. Chandran, M.D., a psychiatrist diagnosed PTSD and Dysthymia in July 2003. Dr. Chandran felt the claimant should be tried on Zoloft, an anti-depressant. In August 2003, Dr. Chandran opined that the claimant was incapable of performing any type of gainful employment due to poor concentration, forgetfulness and confusion whenever asked to perform any type of consecutive tasks. The claimant's symptoms of depression, anxiety and intrusive thoughts and nightmares/flashbacks, along with the preceding, were also felt to preclude the claimant's ability to make decisions or to follow workplace rules. (Exhibit 27F) (R. 23).

Only Dr. Chandran has opined that the claimant is incapable of all word [sic], primarily, due to his psychological impairments. (Exhibits 27F). Although the claimant alleges psychological difficulties for some time, he only began to be seen by Dr. Chandran on April 22, 2003. Allegedly, this was due to the claimant's mother not wanting the claimant to [be] "labeled". [sic] (Exhibit 27F/9 *et seq*.). It also appears that the claimant was the primary souce for this examination as well. Few of the other medical records indicated the claimant had severe psychological limitations. None of them indicated that the claimant could not perform any work whatsoever. Because of the lack of other support from credible medical evidence, the undersigned has given Dr. Chandran's opinion little weight (R. 25).

Plaintiff argues the ALJ did not give "good reasons" for the weight assigned to Dr.

Chandran's opinion and that the ALJ did not weigh Dr. Chandran's opinion using the factors

provided in SSR 96-2p (Plaintiff's brief at pp. 11 and 12). The undersigned finds the ALJ did give

good reasons for the weight he assigned to the opinion of Dr. Chandran in that he opined it was not

supported by the "other . . . credible medical evidence" (R. 25). That "other . . . credible medical evidence," to which the ALJ referred and which was evaluated by the ALJ, did not indicate Plaintiff "had severe psychological limitations." In evaluating the other medical evidence of record, the ALJ determined that Dr. Chandran's opinion was not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques and was "inconsistent" with the other "substantial evidence" in Plaintiff's case record. Specifically, the ALJ considered and evaluated the following evidence of record relative to Plaintiff's psychological limitations:

1. The January 1994 evaluation by V. Landrum, a school psychologist, at which a) Plaintiff's Verbal IQ was scored at 80, Performance IQ was scored at 71, and Full Scale IQ was scored at 73; b) Plaintiff's "performance on testing was inconsistent and that he sometimes missed easy, obvious items but successfully completed more difficult ones"; and c) the psychologist opined Plaintiff should be placed in special education classes (R. 21).

2. The July 1996 evaluation by Dr. Fremouw, at which a) Plaintiff stated he "had no problems with depression or anxiety"; b) Plaintiff's Verbal IQ was scored at 82, Performance IQ was scored at 86, and Full Scale IQ was scored at 82; c) Plaintiff had no history of psychological treatment; and d) Dr. Fremouw did not diagnose any mental disorder (R. 22).

3. The January 1997 school evaluation of Plaintiff, at which a) Plaintiff's Verbal IQ was scored at 90, Performance IQ was scored at 86, and Full Scale IQ was scored at 88; b) the school psychologist opined Plaintiff "had improved some since the January 1994 evaluation; and c) Plaintiff's Bender Motor Gestalt testing was "'age appropriate'" (R. 22).

4. The 1999 work evaluation, at which Plaintiff's skills were found to be inadequate for work with computers (R. 22-23). This work evaluation also revealed Plaintiff was cooperative with evaluators and co-workers, was talkative, had a good attention span, was not distracted by room noises, worked steadily, concentrated adequately, worked independently, worked with little help, produced marginal work product, worked quickly on clerical tasks, worked inconsistently on tasks that required manipulative skills, planned and organized his work, maintained good work effort, showed attention to detail on basic computer, and showed average to below average attention to detail on clerical work (R. 455).

The ALJ also considered and evaluated the following evidence of record that was outside the

relevant period (post June 30, 2000):

1.  The August, 2002, consultative psychological examination conducted by Ms. Joseph, at which a) Plaintiff was observed to be "alert, oriented in three spheres and cooperative"; b) Plaintiff's immediate memory was intact; c) Plaintiff's recent memory was markedly impaired; d) Plaintiff's remote memory was mildly impaired; e) Plaintiff's concentration was moderately impaired; f) Plaintiff's judgment and pace were within normal limits; and g) Plaintiff's persistence was adequate (R. 23).

2.  The October 11, 2002, opinion of Dr. Goots that a) Plaintiff had a cognitive disorder and an anxiety-related disorder; b) Plaintiff had a mild degree of limitation in his activities of daily living and his ability to maintain social functioning; c) Plaintiff had moderate limitations in his ability to maintain concentration, persistence, or pace; and d) Plaintiff had no episodes of decompensation (R. 26, 513, 517, 522).

3.  The January 22, 2003, concurring opinion of Dr. Capage to Dr. Goots' October 11, 2002, opinion (R. 26, 512).

The above listed and recounted evidence of record was considered and evaluated by the ALJ

and he summarized his findings relative to Plaintiff's psychological limitations as follows:

With regard to Plaintiff's activities of daily living, Plaintiff had "at most a 'mild' limitation due to his psychological impairments. He visits with others, mows the grass on occasion and takes care of his personal needs." The ALJ opined that Plaintiff had "only 'mild' limitations" in his ability to maintain social functioning because he spoke to friends on the telephone and visited them in their homes. According to the ALJ, this "level of interaction does not appear to warrant a greater level of limitation." The ALJ opined Plaintiff had a "moderate" level of limitation in his ability to maintain concentration, persistence or pace. The ALJ noted Plaintiff had alleged a great deal of difficulty in this domain. However, Dr. Fremouw did not find any on mental status examination. (Exhibit 10F). Dr. Joseph found the claimant to be moderately impaired with impaired recent memory. (Exhibit 24F). While the claimant alleges great difficulty here, the remainder of the evidence did not support a greater level of limitation (R. 26).

The ALJ relied on the evidence of record in assigning "little weight" to the opinion of Dr.

Chandran. As noted above, there was no "medically acceptable" clinical and laboratory diagnostic

finding that supported Dr. Chandran's opinion and his opinion was inconsistent with the other

"substantial evidence" of record (R. 25).

Additionally, Plaintiff alleges the ALJ did not "show any deference to the treating opinion" as required in SSR 96-2p, which mandates the following:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

The ALJ did show deference to the opinion of Dr. Chandran. He did not reject it, as alleged by Plaintiff (Plaintiff's brief at P. 11). As the ALJ's finding in his decision demonstrates, he evaluated Dr. Chandran's opinion in accord with SSR 96-2p and afforded his opinion "little weight" because it was not supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the other substantial evidence of record (R. 25).

Finally, the undersigned questions the status of Dr. Chandran as Plaintiff's treating physician, an assertion broached by Defendant. In her brief, Defendant writes, ". . . it is arguable that Dr. Chandran's opinion is not that of a treating physician at all, and not entitled to analysis as such, because he had examined [Plaintiff] on only two occasions prior to issuing his conclusory statement regarding [Plaintiff's] ability to work (Tr. 529-34). Thus, he had no treatment history with, or longitudinal picture of, [Plaintiff's] alleged mental impairments as the regulations assume treating physicians will" (Defendant's brief at pp. 11-12). Additionally, it is clear that Dr. Chandran was not Plaintiff's treating physician during the relevant time in that he first evaluated Plaintiff on July 9, 2003, and Plaintiff was insured for disability benefits only through June 30, 2000 (R. 21, 530).

20 C.F.R. § 404.1527 reads, in part, as follows:

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.</u> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> (i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

> (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

As noted above, Dr. Chandran evaluated Plaintiff on July 9, 2003, and then conducted a follow-up evaluation of Plaintiff on August 20, 2003 (R. 530-34, 529). These two visits do not equate a "number" of treatment visits and do not create a treating history that would allow Dr. Chandran to develop "a longitudinal picture of" Plaintiff's impairment. 20 C.F.R. § 404.1527(2)(i). Additionally, the nature of Plaintiff's treatment by Chandran was to obtain disability benefits. Plaintiff's intake summary revealed that Plaintiff was not referred to the care and treatment of Dr.

Chandran by another physician; Plaintiff referred himself. At the intake meeting, Plaintiff listed as his first presenting problem that he was "trying to get disability from injuries that were acquired in a car accident in Sept. of 1993 – lawyer rec. a psychological – has been denied disability several times – obtained his lawyer in Nov. . . " (R. 535). In an August 20, 2003, letter to Plaintiff's lawyer after his follow-up evaluation of Plaintiff, Dr. Chandran noted Plaintiff's efforts, through counsel, to obtain "Social Security Childhood Disability Benefits from his deceased father's record" (R. 527). As to the extent of Dr. Chandran's treatment relationship with Plaintiff, Dr. Chandran completed one psychiatric evaluation of Plaintiff on July 9, 2003, three years after the relevant time under consideration herein. 20 C.F.R. § 404.1527(2)(ii). Based on the language contained in 20 C.F.R. § 404.1527(2) and the evidence of record as to Dr. Chandran's treatment of Plaintiff, the undersigned opines that Dr. Chandran did not enjoy the kind of treatment relationship with Plaintiff that was "likely to . . . provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s)" and did not "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

For the above stated reasons, the undersigned finds the ALJ conducted the analysis of Dr. Chandran in accord with SSR 96-2p; the ALJ did not err in the deference he showed to the opinion to Dr. Chandran; and the ALJ's assignment of "little weight" to the opinion of Dr. Chandran is supported by substantial evidence of record.

### D. RFC/Hypothetical

Plaintiff contends the ALJ erred by failing to include all Plaintiff's actual impairments and limitations in his RFC finding and hypothetical. Specifically, Plaintiff contends the ALJ failed to

was deaf in his right ear and that he could hear on his left side, but in crowds' [sic] sounds 'mumble all together'" (R. 24, 25).

Based on these, and other, considerations, the ALJ found Plaintiff had the following RFC:

> I find the claimant can perform sedentary work, which entails walking no more than one hour at a time with no more that [sic] four hours total of walking in an eight-hour workday. Employment cannot require the claimant to climb. Occasionally stooping, crawling, balancing, kneeling and crouching may be required. Pushing or pulling with his legs cannot be required. Work should not be exposed [sic] the claimant to temperature extremes, unprotected heights or dangerous machinery. The claimant should perform only entry level, low stress jobs that do not involve repeated requests to provide information (R. 26).

As defined in 20 C.F.R. §§ 404.1545 and 416.941, residual functional capacity is what the Plaintiff can still do despite his limitations. Plaintiff's RFC is an assessment based upon all of the relevant evidence. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Plaintiff's medical condition. Observations by treating physicians and psychologists of Plaintiff's limitations may be used in formulating the RFC and these observations must be considered along with the medical records to assist the Commissioner in deciding to what extent the impairments prevent Plaintiff from performing particular work activities.

Based on the RFC, the ALJ asked the following hypothetical questions of the VE:

> ALJ: ... assume a hypothetical individual the Claimant's age, education, and work record. Assume this person is restricted to a light range of work, but the light range of work is degraded by a restriction in walking or standing no more than an hour at a time and no more than four hours total in a day. He can lift the light range of workload which would be 20 occasionally and ten pounds frequently. If a person is precluded from climbing, occasional stooping, crawling, crouching. No pushing with the lower extremities. No temperature extremes. No unprotected height, no dangerous machinery. A person was restricted to entry-level work, so low stress work, which in this case I'm finding is work which does not require the person to have to respond to repeated requests for information from anybody. Doesn't preclude all contact with the public or fellow employees, just can't be pressured constantly to give

35

incorporate Plaintiff's mental limitations in the areas of "attention, concentration, and memory" and hearing limitations (Plaintiff's brief at pp. 12-14). Defendant contends the ALJ's hypothetical question accurately set forth the limitations resulting from Plaintiff's impairments.

The ALJ did find Plaintiff had severe impairments. To be severe, an impairment must significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs," and include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, coworkers and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). As to Plaintiff's severe impairments, the ALJ found as follows: "The medical evidence indicates that the claimant has a seizure disorder, PTSD, borderline intellectual functioning, loss of hearing in his right ear and osteoarthritis, including his alleged back pain, impairments that are severe within the meaning of the regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4" (R. 25). In addition to borderline intellectual functioning, the ALJ, within his decision, opined that Plaintiff "may have a marked limitation in his maintaining concentration, persistence or pace" and "giving the claimant the benefit of any doubt," the undersigned found he had a "'Moderate' level of limitation" in maintaining concentration, persistence or pace (R. 25, 26). Relative to Plaintiff's hearing limitation, the ALJ, within his decision, opined that "[b]ecause the claimant has some hearing, he does not meet the requirements of a listing 2.08, *Hearing Impairments*" and observed that Plaintiff testified at the hearing that "he

34

information out. Is there work in the national or regional economies that a person could perform?

. . .

ALJ:   . . . Hypothetical two, let's assume a hypothetical individual who's restricted to a sedentary range of work. Is there work in the – with the same restrictions in the one above is there work in the national or regional economy such a person could perform?  (R.  570-71).

The Fourth Circuit has held, in *English v. Shalala*, 10 F.3d 1080, 1085 (1993), that when "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment" (citing, *Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.  1989).  As alleged by Plaintiff in his brief, the ALJ included some impairments and limitations in his RFC of Plaintiff and hypothetical to the VE; the ALJ did not, however, include Plaintiff's moderate level of limitation in maintaining concentration, persistence or pace and Plaintiff's severe impairment of right ear hearing loss (Plaintiff's brief at pp.  12-16).

The ALJ did not include any reference whatsoever in his RFC or hypothetical question about Plaintiff's loss of hearing in his right ear, an impairment found to be severe by the ALJ. Additionally, even though the ALJ included in his RFC that Plaintiff could perform only entry level, low stress jobs that did not involve repeated requests to provide information was sufficient as to Plaintiff's severe impairment of borderline intellectual functioning, it was not sufficient as to his finding that Plaintiff had a "'moderate' level of limitation" in maintaining concentration, persistence or pace (R.  25, 26).

The Fourth Circuit has not squarely addressed the issue of what language must be included in a hypothetical question when a plaintiff has a moderate limitation in his or her ability to maintain concentration, persistence, or pace; however, other circuits have.  The Eighth Circuit, in *Brachtel*

36

*v. Apfel*, 132 F.3d 417 (1997), held that a hypothetical question that included the ability "to do only simple routine repetitive work, which does not require close attention to detail [and] no[] work at more than a regular pace" was sufficient for a claimant who "often" exhibited limitations of concentration, persistence, or pace. The Eighth Circuit also held, in *Howard v. Massanair*, 255 F.3d 577 (2001), that a hypothetical, "upon which . . . (the ALJ) relied to deny social security claimant disability and supplemental security income benefits, which assumed that claimant was able to do simple, routine, repetitive work, adequately captured claimant's deficiencies in concentration, persistence, or pace, and thus, was substantial evidence to support award or denial of social security disability benefits." In the instant case, the ALJ made no such inclusion relative to Plaintiff's moderate level limitation in maintaining concentration, persistence, or pace in the hypothetical questions he posed to the VE. The Fourth Circuit has held that "[h]ypothetical questions asked of vocational expert in disability case were not proper where they did not ensure that the expert knew what claimant's abilities and limitations were. *Walker v. Bowen*, 889 F.2d 47 (1989). The VE could not consider Plaintiff's limitation in maintaining concentration, persistence, or pace or Plaintiff's severe impairment of right hearing loss in formulating a response to the ALJ's hypothetical questions because those hypothetical questions were inadequate. The undersigned finds, therefore, that substantial evidence does not support the ALJ's RFC and hypothetical questions.

### E.  Vocational Expert/DOT

Plaintiff contends the ALJ erred by failing to resolve inconsistencies between the VE testimony and the Dictionary of Occupational Titles, as required by SSR 00-4p. Defendant contends substantial evidence supports the ALJ's conclusion that Mr. Valentine could perform the jobs identified by the vocational expert.

SSR 00-4p mandates, in part, the following:

PURPOSE: This Ruling clarifies our standards for the use of vocational experts (VEs) who provide evidence at hearings before administrative law judges (ALJs), vocational specialists (VSs) who provide evidence to disability determination services (DDS) adjudicators, and other reliable sources of occupational information in the evaluation of disability claims. In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), . . . and explain in the determination or decision how any conflict that has been identified was resolved.

Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information in the DOT; and

If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

At the administrative hearing, the following question/answer exchange occurred between the

ALJ and the VE:

ALJ:   . . . assume a hypothetical individual the Claimant's age, education, and work record. Assume this person is restricted to a light range of work, but the light range of work is degraded by a restriction in walking or standing no more than an hour at a time and no more than four hours total in a day. He can lift the light range of workload which would be 20 occasionally and ten pounds frequently. If a person is precluded from climbing, occasional stooping, crawling, crouching. No pushing with the lower extremities. No temperature

38

extremes. No unprotected height, no dangerous machinery. A person was restricted to entry-level work, so low stress work, which in this case I'm finding is work which does not require the person to have to respond to repeated requests for information from anybody. Doesn't preclude all contact with the public or fellow employees, just can't be pressured constantly to give information out. Is there work in the national or regional economies that a person could perform?

VE:   I believe that would total issue would eliminate all light level work, Your Honor.

ALJ:   On what grounds?

VE:   Well, the – by definition you have to be able to work – walk six of eight hours by definition and then there are few jobs, a very limited number of jobs that would require less than that because – for example like ticket taker and then the public part of that would seem to eliminate that, or even like parking lot attendant.

ALJ:   Does a ticket taker have to respond to repeated requests for information?

VE:   Well, their in cognitive would be regular consistent communication with the public. That's the way I was looking at it, that's different from your – what you're wanting to consider.

ALJ:   All right. Hypothetical two, let's assume a hypothetical individual who's restricted to a sedentary range of work. Is there work in the – with the same restrictions in the one above is there work in the national or regional economy such a person could perform?

VE:   Yes, Your Honor, at the sedentary level machine tender, sedentary, 141,000 nationally, 1400 regionally, or general office clerk, sedentary 299,000 nationally, 2900 regionally.

ALJ:   Are those jobs consistent with the <u>Dictionary of Occupational Titles</u>?

VE:   Yes, sir (R. 570-71).

As this questioning by the ALJ and testimony of the VE demonstrate, the ALJ attempted to identify any conflict between the VE's testimony and the information contained in the DOT in conformance with the aforementioned mandates of SSR 00-4p. Plaintiff's assertion that the ALJ

39

erred because he relied on the VE's testimony, which provided job listings, such as "machine tender" with "290 results for the general search term 'machine tender,' with no specific job entitled, 'machine tender,' being located" and "general office clerk" with no such job listed in the DOT, is not accepted by the undersigned (Plaintiff's brief at pp. 17-18). SSR 00-4p states, in part, that "[t]he DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs." The VE listed occupations, which "represents numerous jobs," and not specific jobs which could be performed by Plaintiff based on the ALJ's hypothetical question, as permitted by SSR 00-4p.

The undersigned has considered the assertions of Plaintiff in light of the language found in SSR 00-4p and finds the ALJ correctly applied SSR 00-4p in that he inquired of the VE as to any such conflict. Additionally, the undersigned finds the ALJ was correct in his accepting the VE's answer to the hypothetical question as to what jobs existed which could be performed by Plaintiff because the occupations listed in the DOT, and to which the VE referred, are "collective" descriptions of occupations and not specific jobs. The VE's testimony was, therefore, sufficient.

Similarly, there is no apparent conflict between the ALJ's hypothetical question and the VE's testimony that Plaintiff could perform the job of general office clerk. Plaintiff asserted the "Office Clerk" job, listed as 209.562-010, was "very like the job to which the VE was referring" and was classified as "'light'" and "'semi-skilled'"; thus, Plaintiff alleged the job listed by the VE was "entirely inconsistent with the hypothetical issued by the ALJ" (Plaintiff's brief at p. 18). Plaintiff's assertion that the job of "general office clerk" offered by the VE in response to the ALJ's hypothetical is the job titled "office clerk" that he located in the DOT is not supported by any

evidence and is a mere assumption on the part of the Plaintiff. The ALJ asked the VE a hypothetical; the VE responded with a job that was available in the regional economy, that was based on Plaintiff's limitations, and that was listed in the DOT. Additionally, inasmuch as the ALJ asked the VE if his response to the hypothetical question was consistent with the DOT and inasmuch as the VE responded in the affirmative, they fulfilled their obligations as to the resolution of apparent conflicts.

The undersigned finds the ALJ's reliance on the VE's testimony is not reversible error because the VE offered jobs which were composites of jobs which Plaintiff could perform; the ALJ inquired as to any conflicts between the VE and the DOT in accordance with the mandates of SSR 00-4p; and substantial evidence supports the decision by the ALJ.

## VI. RECOMMENDATION

In accord with my findings and conclusions set forth herein, it is my RECOMMENDATION that Defendant's Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment each be GRANTED, IN PART, and each be DENIED, IN PART, and this action be REMANDED to the Commissioner for the SOLE and LIMITED PURPOSE of propounding a proper hypothetical question to a vocational expert, using special written interrogatories, which join Plaintiff's "moderate level of limitation in maintaining concentration, persistence, or pace and Plaintiff's severe impairment of right ear hearing loss" with the other impairments ALJ Levine propounded to VE Bell during the hearing of September 3, 2003 (R. 570-71).

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___4___ day of January, 2006.


JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE